USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 06/10/2019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
SECURITIES AND EXCHANGE COMMISSION,   :
:
                  Plaintiff,                           :
:       18-CV-4930 (VEC)
                -against-                       :
:      **OPINION AND ORDER**
BENJAMIN ALDERSON, and               :
BRADLEY HAMILTON,                     :
:
                  Defendants.    :
------------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

The Securities and Exchange Commission ("SEC") accuses Defendants of violating Section 206 of the Investment Advisors Act of 1940 (codified at 15 U.S.C. § 80b-6) by, among other things, misrepresenting the tax consequences of an investment option offered by their former employer, Brite Advisors USA, Inc. (formerly deVere USA, Inc. and hereinafter "DVU"). DVU has now asserted attorney-client privilege and work-product protection over documents that may be relevant to Defendants' ability to mount a defense. Those documents consist of tax opinions, which were prepared by DVU's outside counsel, and communications between DVU and attorneys at a compliance consulting firm, MarketCounsel, LLC ("MarketCounsel"). As to the tax opinions, the Court concludes that they are not work product and that DVU has waived any attorney-client privilege by voluntarily disclosing the opinions to a third party. As to the MarketCounsel communications, the Court concludes that only Entry Nos. 46 and 47 of the privilege log, excluding document CTRL00465984, are privileged and protected from disclosure.

**I.     BACKGROUND**

DVU is a registered investment adviser whose client-base consisted primarily of British nationals residing in the United States. Compl. (Dkt. 1) ¶¶ 20–21. Between June 2013 and March 2017, DVU, through its investment adviser representatives, advised its British clients to withdraw the cash value of their pensions in the United Kingdom and transfer the money to an off-shore pension plan, known as a Qualifying Recognized Overseas Pension Scheme ("QROPS"). *Id.* ¶¶ 2, 21. At all relevant times in the Complaint, Alderson was DVU's CEO, Alderson Answer (Dkt. 25) ¶ 1, and Hamilton was a DVU Area Manager, Hamilton Answer (Dkt. 26) ¶ 2. Both Alderson and Hamilton were also investment advisers, who counseled clients to transfer their pensions to a QROPS. Alderson Answer ¶ 2; Hamilton Answer ¶ 2.

According to the SEC, Defendants and other DVU advisers earned a commission equal to 3.5 % of each client's cash transfer, a conflict of interest required to be disclosed under the Investment Advisers Act. Compl. ¶ 4; Hamilton Answer ¶¶ 3–4. DVU advisers also allegedly misrepresented the range of investment options available through the QROPS, as well as the associated tax consequences. Hamilton Answer ¶¶ 6, 8. Defendants intend to argue, at least as to the alleged misrepresentation of tax consequences, that they relied in good faith on the advice of counsel. Alderson Answer at 18 ("Alderson at all times relied in good faith upon the advice and supervision of DVU and deVere Group's Legal and Compliance Departments[.]"); Hamilton Answer ¶ 115 ("Defendant Hamilton, in good faith, relied upon the instructions and advice of his superiors at DVU and DVG, and DVU's Chief Compliance Officer and Counsel.").

Tax opinions obtained by DVU from its outside counsel, Carlton Fields, and advice provided by a compliance consultant, MarketCounsel, are purportedly relevant to Defendants' advice-of-counsel defense. DVU has refused to allow Defendants to use those documents and has asserted attorney-client privilege and work-product protection to resist their production. *See*

*United States v. Wells Fargo Bank, N.A.*, 132 F. Supp. 3d 558, 566 (S.D.N.Y. 2015) (holding that employee is unable to assert advice-of-counsel defense when employer refuses to waive attorney-client privilege).

**A. DVU's Relationship with MarketCounsel**

MarketCounsel is a consulting firm staffed with licensed attorneys. DVU retained it in August 2012 to assist with compliance with federal securities laws. Byrne Decl. (Dkt. 48) ¶¶ 8, 13.

In October 2014, the SEC commenced an examination of DVU. *See* Byrne Decl. ¶ 17. Throughout the course of the SEC's examination, DVU's in-house counsel sought and received advice from MarketCounsel's compliance personnel, who, although licensed attorneys, were retained pursuant to an agreement that expressly disclaimed the existence of an attorney-client relationship. Those communications, as reflected in DVU's privilege log, are now the subject of the SEC's motion to compel and have been submitted to the Court for *in camera* review.

The manner in which MarketCounsel structures its client relationships merits discussion. Brian Hamburger, an attorney, co-founded MarketCounsel, LLC, and the Hamburger Law Firm, a related entity. Dkt. 43 ¶¶ 9–10. The Hamburger Law Firm offers a traditional, billable arrangement for legal representation and advice, whereas MarketCounsel offers membership packages with varying levels of compliance-related services other than legal representation and advice. The two entities, however, are cross-staffed, such that an associate of the Hamburger Law Firm who provides legal advice to clients is simultaneously a compliance consultant who provides non-legal services. Prospectus (Dkt. 43-9) at 4, 6. The theoretical line between legal and non-legal services blurs even further when MarketCounsel promotes the latter by emphasizing the legal experience of its compliance personnel. Prospectus at 5 ("Each compliance professional is a seasoned securities attorney with years of experience as well as

3

often having skills garnered from employment within the securities industry. This depth of knowledge allows our members to have such confidence in our interactions.").

In what appears to have been a penny wise but pound foolish decision, DVU opted for membership with MarketCounsel, rather than the more expensive law firm engagement. *See* Byrne Decl. ¶ 13. MarketCounsel's membership prospectus contains numerous disclaimers regarding the nature of the relationship between its clients and the compliance professionals who happen to be attorneys. The prospectus specifically states that "under a MarketCounsel engagement, our staff attorneys do not serve as attorneys for our members. These same individuals may be engaged to serve as attorneys for our members through our separate but affiliated law firm, the Hamburger Law Firm. This representation is done under a separate written agreement and fee." Prospectus at 6. The prospectus notes that, in keeping with ethical guidelines regarding the practice of law, MarketCounsel, as a consulting firm, "is unable to perform" traditional legal services. *Id.*

The terms and conditions of the prospectus also emphasize, more than once, that MarketCounsel "do[es] not provide legal or accounting services and [that] no portion of the Services should be considered legal advice." *Id.* at 14. "Services" is broadly defined as the specifically delineated member benefits, as well as any "Supplemental Services" provided by MarketCounsel that are not included in the membership. *Id.* The prospectus further explains that, "[w]hile certain of MarketCounsel's employees are attorneys, none of them are providing legal advice to you under this Agreement. Communications between you and us under this Agreement are not protected by any privilege, attorney-client or otherwise." *Id.*

In early October of 2014, DVU renewed its membership with MarketCounsel, again opting against an engagement with the Hamburger Law Firm. Ellis Decl. (Dkt. 43), Exs. L, M. Around the time of the renewal, the SEC commenced its examination of DVU and submitted a

number of requests for information. *See* Byrne Decl. ¶ 17; Privilege Log (Dkt. 48-1). As indicated in DVU's privilege log, MarketCounsel, chiefly through staff attorney Meredith Abrams, provided advice and support to DVU's in-house counsel, Martin Byrne, throughout the examination. *See id*. DVU claims attorney-client privilege over all 47 entries in the privilege log and work-product protection as to Entry Nos. 46 and 47.

As confirmed by the Court's *in camera* review, the communications identified in the privilege log, which are the subject of the SEC's motion to compel production, consist primarily of Byrne's requests for advice on the SEC examination and exchanges of draft responses to the SEC's information requests. *See id.*

### B. DVU's Tax Opinions

DVU also claims attorney-client privilege and work-product protection over a 2011 tax opinion and a 2013 supplemental opinion provided by DVU's counsel, Carlton Fields. Both opinions address the United States tax consequences of QROPS. Napierala Decl. (Dkt. 45) ¶¶ 4–5. DVU and Defendants largely dispute whether the tax opinions were intended to be and in fact were kept confidential.

DVU provided the 2011 tax opinion to Alderson, who at the time was working for DVU's parent company. DVU recruited Alderson to be DVU's CEO and provided the tax opinion to Alderson to prove that the investment scheme was legal. Alderson Decl. (Dkt. 52-1) ¶¶ 4–6.

Defendants aver that the 2011 and 2013 tax opinions were intended to be relied upon by DVU's investment advisers in their conversations with prospective clients. *Id.* ¶¶ 8–9; Hamilton Decl. (Dkt. 50) ¶ 3. Depositions of other investment advisers confirm that they were instructed to tell clients, if asked, that DVU had obtained tax opinions indicating that QROPS would not be taxable in the United States. Dkts. 51-2, 51-3. Although it appears that the conclusions of the

tax opinions were shared with DVU clients, there is no indication that the tax opinions themselves were directly provided to any clients.

In or about September and October of 2013, Alderson, in his capacity as DVU's CEO, transmitted the 2011 and 2013 tax opinions to DVU's accounting firm, BDO USA, LLP. Alderson Decl. ¶ 10; Byrne Supp. Decl. (Dkt. 56) ¶¶ 11–12. DVU had a practice of referring clients or prospective clients who had questions about the tax consequences of the QROPS to BDO for a consultation. Alderson Decl. ¶¶ 10–11; Dkts. 51-2. DVU sent the opinions to BDO so that James Cassidy, BDO's Senior Tax Director, could incorporate the opinions' conclusions into BDO's advice to clients—and presumably reach the same conclusion that the QROPS was not taxable in the United States. *See* Alderson Decl. ¶ 11.

DVU's in-house counsel reportedly told Defendants that the 2013 opinion was solely for internal use and was not to be distributed externally. Byrne Supp. Decl. ¶ 13. Both tax opinions also contained a boilerplate disclaimer that the "[o]pinions can be relied upon solely by" DVU and that the "opinion[s] [are] not to be quoted, in whole or in part, without the express prior written consent of" DVU's counsel, Carlton Fields. *Id.* ¶ 14.

Copies of the tax opinions are currently in the SEC's possession. Pursuant to Rule 26(b)(5)(B), the agency has, however, sequestered those opinions without review pending a ruling on DVU's claim of privilege. Napierala Decl. ¶ 8.

## II. DISCUSSION

DVU has the burden of showing that the MarketCounsel communications and the Carlton Fields tax opinions are protected by attorney-client privilege or the work-product doctrine. *See In re Cty. of Erie*, 473 F.3d 413, 418 (2d Cir. 2007). The attorney-client privilege attaches "(1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client,

(6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived." *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 119 F.3d 210, 214 (2d Cir. 1997) (citation omitted); *United States v. Tomero*, 471 F. Supp. 2d 448, 450–51 (S.D.N.Y. 2007) (same). The work-product doctrine, codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure, protects documents that "can fairly be said to have been prepared or obtained because of the prospect of litigation." *United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998).

### A. DVU's communications with MarketCounsel, with few exceptions, are not protected by attorney-client privilege or the work-product doctrine.

DVU asserts attorney-client privilege over all 47 entries in its privilege log and work-product protection over Entry Nos. 46 and 47. Entry Nos. 1 through 45 on the Privilege Log are not privileged because DVU could not have reasonably believed that MarketCounsel's compliance professionals were acting as attorneys. With the exception of the communication designated as CTRL00465984 on the privilege log, Entry Nos. 46 and 47 are, however, protected by the attorney-client privilege because they concerned requests for legal advice outside the scope of the membership agreement; those entries are also entitled to work-product protection because they were prepared in anticipation of litigation.

As to attorney-client privilege, the only dispute is whether DVU and MarketCounsel's consultants, who happen to be attorneys, had a relationship that could give rise to attorney-client privilege.[1] The Court must "construe the privilege narrowly because it renders relevant information undiscoverable" and must "apply it 'only where necessary to achieve its purpose.'" *In re Cty. of Erie*, 473 F.3d at 418 (quoting *Fisher v. United States*, 425 U.S. 391, 403 (1976)).

---

[1] DVU does not assert that MarketCounsel's services were "necessary" to enable effective consultation between DVU and its in-house counsel. *See United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961); DVU Br. (Dkt. 64) at 4–5 ("With respect to the Logged Communications, DVU has not asserted the *Kovel* privilege.").

7

For privilege to attach to the communications at issue, DVU must have sought *legal* advice from MarketCounsel's consultants in their capacity as attorneys. *Tomero*, 471 F. Supp. 2d at 450–51. DVU and MarketCounsel need not have had an actual attorney-client relationship, so long as DVU had a reasonable, good-faith belief that it was seeking legal advice from MarketCounsel's consultants in their capacity as attorneys. *See United States v. Keplinger*, 776 F.2d 678, 701 (7th Cir. 1985); *Merck Eprova AG v. ProThera, Inc.*, 670 F. Supp. 2d 201, 210 (S.D.N.Y. 2009).

The SEC makes a persuasive argument that DVU could not have had a good faith belief that MarketCounsel's consultants were acting in their capacity as attorneys because DVU had repeatedly rejected an attorney-client relationship with the Hamburger Law Firm in favor of a MarketCounsel membership (whose terms and conditions expressly disclaim any attorney-client relationship or privilege whatsoever). While DVU argues that it chose the membership in part because MarketCounsel employed the same attorneys as the Hamburger Law Firm and offered access to those attorneys through the membership, the conditions of membership made clear that any advice given by those attorneys, although informed by their legal training and experience, should not be relied upon as legal advice or viewed as part of an attorney-client relationship. The disclaimer that communications with MarketCounsel were not privileged is strong circumstantial evidence that DVU could not have expected their exchanges to be protected from disclosure.

The Court concludes that the disclaimers and the absence of a representation agreement, although not dispositive,[2] create a strong presumption that the communications are not protected by attorney-client privilege. The existence of attorney-client privilege depends on the

---

[2] "No special formality is required to demonstrate the establishment of the [attorney-client] relationship." *ProThera, Inc.*, 670 F. Supp. 2d at 210.

reasonableness of the putative client's belief that he or she is seeking legal advice from an attorney. *See Catizone v. Wolff*, 71 F. Supp. 2d 365, 371 (S.D.N.Y. 1999). The reasonableness of that belief must be informed, at least in part, by the putative lawyer's expressed refusal to serve as the putative client's attorney. An attorney engagement, like any other professional relationship, derives from mutual consent.[3] Accordingly, absent circumstances that suggest otherwise, the Court presumes that a communication between a person and a lawyer is not privileged when it follows an unequivocal disclaimer that the latter is not providing legal advice and is not acting in his or her capacity as an attorney.

Here, the disclaimers in the membership prospectus were clear, specific, and repeated *ad nauseam*. Moreover, DVU, through its in-house counsel, was given at least two opportunities to weigh the advantages of a law firm engagement, which would have created an attorney-client relationship, against a less expensive non-law firm membership, which would not. By all indications, DVU's in-house counsel was a sophisticated actor who was aware of the differences in the services being offered and intentionally recommended that DVU pursue the membership option. *See* Dkt. 43-12 ("Im [sic] going to advise Ben to take membership . . . . Will discuss with him and confirm."). DVU's knowing acceptance of MarketCounsel's disavowal of any attorney-client relationship and any communications privilege establishes the baseline for their relationship.

That presumption may nonetheless be rebutted if DVU's relationship with MarketCounsel underwent a material transformation, either by express agreement or if the scope

---

[3] Disclaimers are generally an important consideration when determining the nature of the relationship between an attorney and a non-attorney. For instance, according to Rule 5.7 of New York State's Rules of Professional Conduct, the disciplinary rules do not apply to an attorney providing what could otherwise be reasonably construed as legal services if the attorney "has advised the person receiving the services in writing that the services are not legal services and that the protection of a client-lawyer relationship does not exist." New York State Unified Court System, Part 1200 Rules of Professional Conduct, Rule 5.7(a)(3)–(4) (Jan. 1, 2017), *available at* https://www.nycourts.gov/LegacyPDFS/rules/jointappellate/ NY-Rules-Prof-Conduct-1200.pdf.

9

of services rendered by MarketCounsel clearly exceeded what was originally contemplated by the membership agreement. Those circumstances could support a reasonable belief that an attorney-client relationship had developed over time, even if one did not exist initially.

After reviewing the documents *in camera*, the Court concludes that the communications identified in Entry Nos. 1–45 stayed within the bounds of the membership agreement, and that DVU's relationship with MarketCounsel never evolved to that of attorney-client. Although MarketCounsel's attorneys frequently provided what otherwise might reasonably be considered legal services during the course of the SEC examination, the membership agreement specifically contemplates the provision of such services—and regards those services to be outside the scope of any attorney-client relationship. Indeed, the membership prospectus states that MarketCounsel will "provide counsel" "through the entire examination cycle, from notification of the upcoming examination through the receipt of any deficiency letter." Prospectus at 4. Virtually all of the communications listed on the privilege log consist of advice provided during the SEC examination process. *See* Privilege Log, Entry Nos. 1–41, 45. Entry Nos. 42–44 do not pertain to the SEC examination but do not appear to be beyond the scope of the membership agreement either.

Entry Nos. 46 and 47 include discussions of services that were not available under the MarketCounsel membership, however. As indicated in the privilege log, those communications occurred after the SEC had already issued its post-examination findings. In those communications, DVU sought legal advice from MarketCounsel regarding its response to those findings. Although no legal advice was ultimately given,[4] communications made in an effort to

---

[4] In these communications, the MarketCounsel attorney stated clearly that DVU was seeking legal advice, which the attorney could not provide under the existing relationship with DVU.

obtain legal advice are protected by attorney-client privilege. *See In re Cty. of Erie*, 473 F.3d at 419. And because the membership agreement explicitly viewed the issuance of a deficiency letter as the bright line separating MarketCounsel's compliance services from Hamburger Law Firm's legal services, DVU's post-findings communications are best seen as statements made for the purpose of obtaining legal advice. Entry No. 46, however, contains a forwarded email (CTRL00465984) dated Nov. 19, 2014, which predated the SEC's findings and was sent to DVU with the express understanding that it had been created pursuant to the terms of the membership agreement. The Court therefore holds that Entry Nos. 46 and 47, with the exception of CTRL00465984, are protected by attorney-client privilege.

Entry Nos. 46 and 47, with the exception of CTRL00465984, are also protected under the work-product doctrine, which shields documents generated "because of the prospect of litigation." *Adlman*, 134 F.3d at 1202. As mentioned previously, the disputed communications were drafted as part of DVU's effort to craft a response to the SEC's deficiency letter. By that point, the prospect of litigation was sufficiently likely that the Court cannot say, after reviewing the documents *in camera*, that the documents "would have been created in essentially similar form irrespective of [the anticipated] litigation."[5] *Adlman*, 134 F.3d at 1202; *In re Veeco Instruments, Inc. Sec. Litig.*, No. 05-MD-01695, 2007 WL 724555, at *4 (S.D.N.Y. Mar. 9, 2007). As to the communication that is designated CTRL00465984, the Court finds that, at the time of its creation, the possibility of litigation was too remote for the prospect of litigation to have had a significant impact on the substance of the document.

---

[5] The SEC has not argued that, notwithstanding any work-product protection, it is nonetheless entitled to the documents. *See Adlman*, 134 F.3d at 1197 ("'[D]ocuments "prepared in anticipation of litigation or for trial' are discoverable only upon a showing of substantial need of the materials and inability, without undue hardship, to obtain their substantial equivalent elsewhere." (quoting Federal Rule 26(b)(3) of Civil Procedure)).

Thus, for the vast majority of the communications at issue, the Court concludes that they are not privileged. The purpose of the attorney-client privilege is "to encourage attorneys and their clients to communicate fully and frankly." *In re Cty. of Erie*, 473 F.3d at 418. DVU will not now be heard to bemoan the lack of such a safe space when its in-house counsel repeatedly opted for a service that disavowed that protection. The Court therefore grants the SEC's motion to compel production as to Entry Nos. 1–45 of the privilege log and as to the email logged as CTRL00465984.

### B. DVU's Tax Opinions

DVU asserts attorney-client privilege and work-product protection over a 2011 tax opinion and a 2013 supplemental opinion, both prepared by Carlton Fields. The Court concludes that any privilege was waived as a result of disclosure to the accounting firm, BDO, because the common interest exception is inapplicable. The Court further finds that the tax opinions were not prepared because of litigation and therefore do not constitute work product.

Defendants contend that DVU has not met its burden of showing that the tax opinions were intended to be and in fact were kept confidential. The conclusions of the tax opinions were not kept confidential and were disclosed to clients and prospective clients—but extrajudicial disclosure of the conclusions may not result in a subject-matter waiver as to the undisclosed portions of the opinions. *See In re von Bulow*, 828 F.2d 94, 102 (2d Cir. 1987) ("Applying the fairness doctrine, we hold therefore that the extrajudicial disclosure of an attorney-client communication—one not subsequently used by the client in a judicial proceeding to his adversary's prejudice—does not waive the privilege as to the undisclosed portions of the communication."). Defendants also argue that disclosure of the 2011 opinion to Alderson effected a waiver, but Alderson was an employee of DVU's parent company at the time. The

12

Court does not have to decide the significance of those two disclosures, however, because DVU's transmission of the tax opinions to BDO alone constitutes a waiver.

Ordinarily, voluntary disclosure of an otherwise privileged document to a third party waives privilege. *In re Grand Jury Proceedings*, 219 F.3d 175, 184 (2d Cir. 2000) ("Clearly, when the corporation as an entity makes the strategic decision to disclose some privileged information, the courts may find implied waiver, as they do in cases involving individuals."). When an officer of a corporate entity discloses a privileged communication, courts must consider whether treating the disclosure as an implied waiver would be unfair. *Id.* at 186. In this case, Alderson, as DVU's CEO and senior manager, made a calculated decision to send the tax opinions to BDO, apparently in an effort to induce BDO to reach the same conclusions as Carlton Fields had reached, so as to convince prospective clients of the tax benefits of the QROPS. Accordingly, Alderson was acting to further DVU's business interests when he transmitted the opinions. The Court therefore finds that Alderson's disclosure was voluntary, made on behalf of DVU as its chief officer, and that, unlike the case of an inadvertent disclosure by an ill-informed agent acting in his individual capacity, Alderson's disclosure may fairly be regarded as an implied waiver by the corporate entity. *Cf. id.* at 185, 188 (holding that corporate officer may not have waived privilege when he testified in individual capacity before grand jury).

DVU argues that the transmission of the tax opinions to BDO does not constitute an implied waiver because DVU and BDO were engaged in a "common legal enterprise" as defined in *Schaeffler v. United States*, 806 F.3d 34 (2d Cir. 2015). In *Schaeffler*, an automotive parts company encountered financial trouble while owing €11 billion to a consortium of banks. *Id.* at 37. In an effort to remain solvent, the company and its majority owner began exploring ways to refinance the debt and to restructure the company. *Id.* During that process, the company

anticipated that its refinancing and restructuring efforts would draw IRS scrutiny and, accordingly, obtained a tax memo from Ernst and Young discussing the tax consequences of the financial maneuvers it was considering. *Id.* at 37–38, 40 (noting that tax practitioner privilege is functional equivalent of attorney-client privilege). The IRS sought the memo and argued that it was not privileged because the company had shared it with the consortium of banks. *Id.* The *Schaeffler* Court disagreed and held that the voluntary disclosure did not waive privilege because the company and the banks were engaged in a "common legal enterprise" to obtain favorable tax treatment for the company, whose insolvency would imperil the banks' €11 billion loan. *Id.* at 40–42. As part of that joint enterprise, the company, Ernst and Young, and the company's outside counsel "worked closely with the Bank Consortium . . . in effectuating the refinancing and restructuring [and] also in analyzing the tax consequences" of the underlying transactions. *Id.* at 38. The sharing of the tax memorandum was, therefore, in service of that enterprise, in that it helped the parties structure their arrangements to increase the likelihood of obtaining a desired tax treatment from the IRS, thereby further benefiting the financial condition of the company and the financial institutions.

The relationship between DVU and BDO differs in many material respects from the facts of *Schaeffler* and does not constitute a "common legal enterprise." Based on the limited facts that DVU has provided, it appears that DVU referred clients who wanted more information or otherwise had doubts about the tax consequences of following DVU's investment advice to BDO. DVU does not dispute that those clients independently paid BDO for personalized tax advice. Hamilton Br. (Dkt. 49) at 3 (citing Alderson Depo. (Dkt. 51-1) at 180). DVU, apparently in an effort to influence BDO's conclusions, sent its tax opinions to BDO, so that BDO might corroborate DVU's representations to its clients. BDO, however, would have been paid by the referred clients regardless of whether it opined that the QROPS was not taxable. To

14

the extent that BDO had any other stake in this scheme, at most it had an incentive to corroborate DVU's conclusions to maintain the health of the referral relationship.

The first critical difference between this case and *Schaeffler* is that BDO, unlike the bank consortium, had no stake in the tax treatment of the QROPS. BDO had an interest in its clients' fees, a general desire to maintain a positive relationship with DVU, and a stake in its own reputation as the provider of accurate tax advice. None of those interests depends on the accuracy of Carlton Fields' opinion that the QROPS was not taxable under United States law. As for client fees, BDO would have been paid regardless of the QROPS's future tax status. As for DVU's referral relationship, BDO may have had an incentive to tell clients that the QROPS was non-taxable, but BDO did not need the QROPS to in fact be non-taxable in order to remain in DVU's good graces. And as for its institutional reputation, BDO had a generalized interest in providing accurate advice, but, again, not a direct stake in whether DVU's product would in fact be non-taxable. Thus, unlike *Schaeffler*, where the banks stood to benefit from the company's tax breaks and thus had a joint interest in structuring the refinancing so those tax benefits would, in fact, materialize, BDO had no stake in the QROPS's taxability.

Second, even assuming that BDO may have had some preference for the QROPS to be deemed non-taxable because it would benefit DVU, a source of referrals, DVU has not met its burden of showing that DVU and BDO were engaged in a joint enterprise to make the QROPS non-taxable under federal law. In *Schaeffler*, the Second Circuit found a common enterprise because the company and the banks, as well as their counsel, were not only jointly investigating the legal and tax consequences of the restructuring and refinancing but were also coordinating and conforming the structure of their transaction in response to those legal conclusions. 806 F.3d at 41–42. Here, there is insufficient evidence for this Court to conclude that DVU ever sought advice from BDO for purposes of conforming an investment product to federal tax law;

15

nor is there any evidence that DVU and BDO ever worked together to design the investment scheme to obtain a tax benefit. To the extent that BDO reached conclusions about the taxability of QROPS, it was apparently to provide advice to BDO's own clients, who were referred by DVU, but not to DVU itself. Thus, DVU has not proven the existence of an agreement of the sort in *Schaeffler*, *i.e.* one that would constitute a "joint . . . strategy . . . decided upon and undertaken by the parties and their respective counsel." *Id.* at 40 (citation omitted).

And finally, even assuming the existence of a joint strategy to achieve a particular legal outcome, a disclosure is only protected by the common interest doctrine if the disclosure was made in furtherance of that legal objective. In *Schaeffler*, one could conclude that the company provided the tax opinions to the bank consortium so that the banks would accede to a refinancing structure that would enable the company to qualify for a tax benefit. *See* 806 F.3d at 41–42. In this case, even if the Court were to conclude that DVU and BDO worked together, at least at some point, to obtain a particular tax benefit, there is no indication that Alderson sent the tax opinions to BDO to achieve that purpose. Indeed, by the time that Alderson disclosed the tax opinions to BDO, DVU was already convinced that QROPS was non-taxable. Notably, Alderson did not solicit any input or comment from BDO regarding Carlton Fields' tax opinions. Rather, the only apparent objective was to convince BDO to echo DVU's advice to prospective clients. To the extent that BDO may have complied with DVU's instructions, BDO and DVU were colluding to drum up business for DVU, not to obtain a particular tax treatment for DVU's investment product. Such an effort does not have a sufficient legal character to constitute a "common legal enterprise."

The tax opinions are also not work product. Documents are entitled to work-product protection if they were prepared "because of" the prospect of litigation. *Adlman*, 134 F.3d at 1202. "Conversely, protection will be withheld from 'documents that are prepared in the

16

ordinary course of business or that would have been created in essentially similar form irrespective of the litigation.'" *Schaeffler*, 806 F.3d at 43 (quoting *Adlman*, 134 F.3d at 1202). In this case, DVU obtained the tax opinions to assess the viability of QROPS as a business model and to improve DVU's sales pitch to investors, rather than in anticipation of litigation. According to Defendants and the deposition testimony of other DVU employees, the tax opinions were intended to legitimize DVU representatives' investment advice, enabling them to present the QROPS as non-taxable and therefore more attractive as an investment option. Based on the Court's review of the 2013 opinion, DVU appears to have obtained the supplemental opinion because the 2011 opinion did not address the tax consequences for one potential type of income. Notably, DVU also "makes no affirmative claim that it would have declined to investigate" the taxability of the QROPS "or that the documents would have been produced in a different form absent the threat of litigation." *In re Welspun Litig.*, No. 16-CV-6792, 2017 WL 10311206, at *3 (S.D.N.Y. Oct. 31, 2017). Because the tax opinions were produced in the ordinary course of DVU's business and would have been created for use by DVU's representatives even absent any prospect of litigation,[6] the Court concludes that the opinions are not protected work product.

In sum, the Court holds that DVU has failed to meet its burden of showing that the tax opinions are protected by attorney-client privilege or the work-product doctrine. Accordingly,

---

[6] DVU claims that the tax opinions were obtained in part because the supposed novelty of the QROPS raised the specter of litigation. Byrne Supp. Decl ¶ 10. The Court finds DVU's generic and conclusory statement of novelty to be unpersuasive. As another court has held, "the mere fact that [a corporation] anticipated that [a possible misrepresentation of a product feature] might result in litigation is insufficient to trigger work-product protection." *See In re Welspun Litig.*, No. 16-CV-6792, 2017 WL 10311206, at *3 (S.D.N.Y. Oct. 31, 2017). Without more, a general sense that the QROPS was "novel," divorced from any explanation as to how that novelty translates into litigation risk for DVU, rather than merely unexpected tax liability for DVU's clients, and occurring well before the SEC commenced its examination in October of 2014, is nothing more than a hunch. That speculative possibility cannot convert a document into work product, because such a remote risk is unlikely to substantially affect the document's creation.

the parties may, consistent with Rule 26(b)(5)(B) of the Federal Rules of Civil Procedure, use or disclose the 2011 and 2013 tax opinions currently sequestered by the SEC.

## III. CONCLUSION

For the foregoing reasons, the SEC's motion to compel production of communications between MarketCounsel and DVU is GRANTED as to Entry Nos. 1–45 and document CTRL00465984 as identified on the Privilege Log. MarketCounsel is directed to produce the documents by **June 14, 2019**, or on a date mutually agreeable to MarketCounsel and the interested parties.

DVU's claim of privilege and work product protection over the 2011 and 2013 Carlton Fields tax opinions is DENIED. To the extent that Defendants do not have copies of the tax opinions, the SEC is directed to produce the opinions to Defendants by **June 14, 2019**, or on a date mutually agreeable to the interested parties.

The Clerk of Court is respectfully directed to terminate docket entries 42, 49, and 54.

**SO ORDERED.**

**Date: June 10, 2019**  
**New York, New York**

**VALERIE CAPRONI**  
**United States District Judge**